# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| IN REGARDS TO THE ARBITRATION BETWEEN | ) ) ) | |
| SHEILA SHARP, | ) ) | |
| Claimant, | ) ) | |
| and | ) | Case No. MC-07-0018-KD-M |
| RIVER BIRCH HOMES, INC., | ) ) ) | |
| Respondent. | ) ) | |

## RESPONDENT RIVER BIRCH HOMES, INC.'S RESPONSE TO SHEILA SHARP'S MOTION TO VACATE ARBITRATION AWARD AND STAY PROCEEDINGS

COMES NOW Respondent River Birch Homes, Inc. ("River Birch"), by and through the undersigned counsel, and pursuant to this Court's September 26, 2007 Order (document no. 5), herewith files this response to Sheila Sharp's Motion to Vacate Arbitration Award and Stay Proceedings ("Motion to Vacate") (document no. 2), and states that Sharp's Motion to Vacate is not well taken and is due to be overruled and denied without an evidentiary hearing. In further support therefor, River Birch would show unto this Court as follows:

1.      The standards for judicial review of a challenge to an arbitration award under 9 U.S.C. §10(a)(2) are well settled. Judicial review of an arbitration award is narrowly limited. *Lifecare International v. CD Medical, Inc.*, 68 F.3d 429, 433 (11th Cir. 1995), citing *Davis v. Prudential Securities, Inc.*, 59 F.3d 1186, 1188 (11th Cir. 1995). Indeed, the Federal Arbitration Act presumes that arbitration awards will be confirmed. *Id.* Consequently, "federal

courts should defer to the arbitrator's resolution of the dispute whenever possible." *Robbins v. Day*, 954 F.2d 679, 682 (11th Cir. 1992). To vacate an arbitration award under 9 U.S.C. §10(a)(2) for arbitrator bias, there must be "evident partiality or corruption" in the arbitrator(s). *Brown v. Rauscher Pierce Refsnes, Inc.*, 994 F.2d 775, 779 (11th Cir. 1993). The alleged partiality must be "direct, definite and capable of demonstration rather than remote, uncertain and speculative." *Lifecare*, 68 F.3d at 433, quoting *Middlesex Mutual Insurance Co. v. Levine*, 675 F.2d 1197, 1201 (11th Cir. 1982). Accordingly, the mere appearance of bias or partiality is not enough to set aside an arbitration award. *Lifecare*, 68 F.3d at 433, citing *Consolidated Coal v. Local 1643, United Mine Workers*, 48 F.3d 125, 129 (4th Cir. 1995).

2.     Sharp has failed to allege or demonstrate any grounds which would justify vacating the arbitrator's award. Sharp avers that the arbitrator (Henry Strickland) was "evidently partial" to River Birch because he "has an affiliation" with one of River Birch's attorneys. (Motion to Vacate, ¶¶7,13). Sharp does not explain how this "affiliation" biased the arbitrator against her in the proceedings. In fact, the arbitrator's June 27, 2007 e-mail spells out the nature of the alleged "affiliation": Strickland taught Scott Simpson at Samford University's Cumberland School of Law (hereafter referred to as "Cumberland School of Law") approximately 15 years ago; Simpson teaches classes as an adjunct professor at Cumberland School of Law; and in his capacity as associate dean at Cumberland School of Law, Strickland communicates regularly with adjunct faculty regarding administrative matters and course problems. (Exhibit 1, Strickland's June 27, 2007 e-mail). Strickland's e-mail concludes,

"Although I know Mr. Simpson well, I do not believe my contacts with him will affect my neutrality in this matter." (Exhibit 1). An insubstantial relationship as described above is simply insufficient to warrant vacatur under 9 U.S.C. §10(a)(2), as the circumstances of Strickland's and Simpson's "affiliation" are too attenuated to create a reasonable impression of partiality on the arbitrator's part. See, e.g., *Austin South I, Ltd. v. Barton-Malow Co.*, 799 F.Supp. 1135, 1142 (M.D. Fla. 1992).

3.      This "affiliation" does not create any inference of bias or partiality on the arbitrator's part. First, Scott Simpson is not River Birch's attorney. Greg Ritchey and Richard Walker of the firm Ritchey & Simpson have represented River Birch.[1] Simpson has not represented River Birch in this matter. (Exhibit 2, Scott Simpson's affidavit, ¶1). *Lifecare, supra*, turned on analogous facts. In *Lifecare*, the losing party at arbitration filed a challenge to the arbitrator's award, claiming the arbitrator was biased because the arbitrator previously had a contentious hearing against another attorney in the same law firm. The Eleventh Circuit Court of Appeals noted that "the incident did *not* involve any of the parties to the arbitration hearing. Rather, it involved an attorney who was involved in the same law firm – White & Case – that represented one of the parties – CD Medical. The White & Case attorney involved in the dispute took no part in the arbitration proceedings ... Regardless, we cannot conclude that [the arbitrator's] failure to disclose the incident created a reasonable impression of partiality." *Lifecare*, 68 F.3d at 434 (emphasis in original). The *Lifecare* Court concluded: "It does not

---

[1] Ritchey and Walker are River Birch's personal attorneys due to insurance issues; Clifton Slaten is River Birch's lead attorney.

follow that an arbitrator's personal feelings in favor of or against one attorney would be transferred to another attorney in the same firm." *Lifecare*, 68 F.3d at 434, quoting *International Produce, Inc. v. A/S Rosshavet*, 638 F.2d 548, 551 n.3 (2nd Cir. 1981). Second, Simpson was not affiliated with Greg Ritchey when this case was initiated; Ritchey & Simpson was formed subsequent to this case's initiation. (Exhibit 2, ¶1). Strickland's e-mail itself notes that Ritchey & Simpson became affiliated "since this matter was initiated." (Exhibit 1). Third, Strickland did not attempt to conceal the potential conflict; he promptly made a supplemental disclosure to the AAA on June 27, 2007 outlining his relationship with Simpson. The AAA's failure to forward Strickland's disclosure to the parties was no fault of Strickland's and cannot be construed as evidence of Strickland's bias. In the Eleventh Circuit, an arbitration award may be vacated due to the "evident partiality" of an arbitrator only when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists. *Gianelli Money Purchase Plan & Trust v. ADM Investor Services, Inc.*, 146 F.3d 1309, 1312 (11th Cir. 1998). Fourth, Sharp was well aware, long before the arbitration of the instant dispute, that Simpson was affiliated with Cumberland School of Law. (Exhibit 2, ¶4). Moreover, Strickland disclosed his position as associate dean at Cumberland School of Law in the arbitrator's disclosures. (Exhibit 3, Strickland's October 9, 2006 arbitrator disclosure statement). Thus, Sharp was aware that Strickland and Simpson had an "affiliation" through Cumberland School of Law well prior to the arbitration hearing and failed to object. Since Sharp had actual knowledge of Strickland's and Simpson's affiliation with the Cumberland School of Law before the arbitration began and

4

failed to make any objection, Sharp evidently did not consider it to be an problem until the arbitrator returned a ruling in River Birch's favor. Sharp waived any objection of arbitrator bias.

4. Sharp argues that *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968) requires that an arbitrator avoid not only actual bias, but the appearance of bias. (Motion to Vacate, ¶17). However, that is not the correct standard. The Eleventh Circuit has held that the concurrence in *Commonwealth Coatings* limits the scope of that holding to situations where the arbitrator fails to disclose a substantial relationship with a party (which is not the case here), and hence the "mere appearance of bias or partiality" is not enough to set aside an arbitration award. *Lifecare*, 68 F.3d at 433.

5. As the moving party, Sharp bears the burden of setting forth and demonstrating arbitrator bias. *O.R. Securities v. Professional Planning Associates*, 857 F.2d 742, 748 (11th Cir. 1988); *Austin South I*, 799 F.Supp. at 1142. Sharp's cursory allegations are vague, unfocused, uncertain, and speculative; Sharp's speculation falls far short of the type of evidence which is "direct, definite, and capable of demonstration," *Gianelli*, 146 F.3d at 1312, which is required to vacate the arbitration award.

6. Moreover, the arbitrator's award was plainly supported by the facts of this case. The arbitration transcript demonstrates that the evidence amply supports the arbitrator's ruling. The evidence shows that Sharp was required to send timely notice of repairs to River Birch. (Exhibit 4, arbitration transcript, Vol. I, pp. 164:19–166:12). Sharp failed to timely notify River Birch of certain repairs. (Exhibit 4, Vol. I, pp. 90:14–92:25, 123:14–125:21,

5

164:7–167:6). Furthermore, Sharp was responsible for signing off on work orders. It was clear from the evidence that Sharp signed off on work orders reflecting her approval of repairs completed by River Birch. (Exhibit 4, Vol. I, pp. 88:3–90:9, 91:21–92:11, 169:2–171:17). With regards to any alleged problems with the walls, the evidence also shows that Sharp's expert, Michael Gertler, used a moisture meter that was ineffective and inconclusive in detecting moisture in the subject manufactured home. (Exhibit 4, Vol. I, pp. 226:14–235:22; Vol. II, pp. 44:17–59:23). Moreover, Mr. Gertler admitted that there was not a moisture problem in the subject manufactured home. (Exhibit 4, Vol. II, pp. 44:17–59:23). Therefore, the ruling is supported by the evidence. River Birch proffers the foregoing evidence, not to retry the arbitration matter, but to demonstrate that the arbitrator's ruling was a correct application of the law to the undisputed facts of the case.

7.    This Court has the authority to conduct a full evidentiary hearing on the merits of Sharp's Motion to Vacate. See, e.g., *University Commons-Urbana, Ltd. v. Universal Constructors, Inc.*, 304 F.3d 1331, 1341 (11th Cir. 2002) ("some motions challenging arbitration awards may require evidentiary hearings outside the scope of the pleadings and arbitration record"). However, the district court "need not conduct a full hearing on a motion to vacate or confirm; such motions may be decided on the papers without oral testimony." *Mays v. Lanier Worldwide, Inc.*, 115 F.Supp.2d 1330, 1335 (M.D. Ala. 2000), quoting *Booth v. Hume Publishing, Inc.*, 902 F.2d 925, 932 (11th Cir. 1990). Because Sharp's allegations of partiality against the arbitrator are so "remote, uncertain, and speculative," *Lifecare*, 68 F.3d at 433, this Court should exercise its discretion in favor of denying Sharp's Motion to Vacate

without an evidentiary hearing.

WHEREFORE, for the above-stated reasons and citations to authority, Respondent River Birch Homes, Inc. prays that this Court will issue an Order confirming the arbitrator's award in its entirety, and denying Sheila Sharp's Motion to Vacate the arbitrator's award. River Birch further prays for such other, further, or different relief to which it may be equitably entitled, whether specifically prayed herein or not.

Respectfully submitted this the 9th day of October, 2007.

/s/ CLIFTON E. SLATEN
**CLIFTON E. SLATEN** (Ala. ID SLA013)
**GREGORY S. RITCHEY** (ASB 8193-H68G)
**RICHARD S. WALKER** (ASB 8719-L70R)
**ATTORNEYS FOR RESPONDENT**
**RIVER BIRCH HOMES, INC.**

**OF COUNSEL:**

**SLATEN & O'CONNOR, P.C.**
Winter Loeb Building
105 Tallapoosa Street, Suite 101
Montgomery, AL 36104
(334) 396-8882 (P)
(334) 396-8880 (F)
cslaten@slatenlaw.com

**RITCHEY & SIMPSON, PLLC**
3288 Morgan Drive, Suite 100
Birmingham, AL 35216-3084
(205) 876-1600 (P)
(205) 876-1611 (F)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

IN REGARDS TO THE ARBITRATION )
BETWEEN )
                          )
SHEILA SHARP, )
                          )
      Claimant, )
                          )
and )      **Case No. MC-07-0018-KD-M**
                          )
RIVER BIRCH HOMES, INC., )
                          )
      Respondent. )

## CERTIFICATE OF SERVICE

I hereby certify that on October 9th, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve electronic notice upon the following CM-ECF system participants:

J. Charles McCorquodale, Esq.
McCorquodale & McCorquodale
P.O. Drawer 1137
Jackson, AL 36545
*Counsel for Claimant Sheila Sharp*

                                    Respectfully submitted,

                                      /s/ CLIFTON E. SLATEN
                                      **CLIFTON E. SLATEN** (Ala. ID SLA013)
                                      **GREGORY S. RITCHEY** (ASB 8193-H68G)
                                      **RICHARD S. WALKER** (ASB 8719-L70R)
                                      **ATTORNEYS FOR RESPONDENT**
                                      **RIVER BIRCH HOMES, INC.**

F:\Gen Litigation\Firemans Fund\River Birch Homes\Pleadings\RespondMotionVacateArbitration.wpd

**EXHIBIT 1**

## Joyce Minano

**From:** Strickland, Henry ,III [hcstrick@samford.edu]

**Sent:** Wednesday, June 27, 2007 2:58 PM

**To:** Joyce Minano

**Subject:** Sharp v. River Birch Homes

Dear Ms. Minano,

I need to make the following new disclosure in teh above-referenced matter (AAA No. 30 181 00650 06):

I understand that Mr. Gregory Ritchey (attorney for respondent River Birch Homes, Inc.) has affiliated with Mr. Scott Simpson under the firm name of Ritchey & Simpson, PLLC since this matter was initiated. Mr. Simpson was a student in some of my classes when he attended Samford University School of Law approximately 15 years ago. In addition, Mr. Simpson currently teaches courses as an adjunct professor at Cumberland, where I am a professor and associate dean for academic affairs. In my capacity as associate dean, I prepare class schedules (determining who teaches what classes and when). I also am responsible for identifying and recruiting adjunct faculty, and I was associate dean when Mr. Simpson began teaching here as an adjunct professor. I also communicate regularly with adjunct faculty regarding administrative matters and any problems in their courses. Although I know Mr. Simpson well, I do not believe my contacts with him will affect my neutrality in this matter.

Thanks.

--Henry

Henry C. Strickland
Associate Dean and Professor of Law
Cumberland School of Law
Samford University
Birmingham, AL 35229
205-726-2411
Fax: 205-726-4051
email: hcstrick@samford.edu

6/27/2007

**EXHIBIT 2**

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**IN RE THE ARBITRATION BETWEEN**

| | | |
|---|---|---|
| **SHEILA SHARP,** | * | |
| | * | |
| **Claimant,** | * | |
| | * | |
| **v.** | * | **Case Number: mc-07-0018-KD-M** |
| | * | |
| **RIVER BIRCH HOMES, INC.,** *et al.,* | * | |
| | * | |
| **Respondents.** | * | |

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| | ) **AFFIDAVIT OF W. SCOTT SIMPSON** |
| **JEFFERSON COUNTY** | ) |

Before me, the undersigned authority, in and for said state and county, personally appeared, W. Scott Simpson, who being by me first duly sworn, under oath, deposes and says:

1.    My name is W. Scott Simpson and I am over the age of 19 years. In May of 2007, Greg S. Ritchey and I formed the firm, Ritchey and Simpson, PLLC. Ms. Sharp's case was a case brought over to Ritchey & Simpson by Mr. Ritchey from his previous law firm, Ritchey & Ritchey, P.A. Neither prior to the formation of Ritchey & Simpson nor since the case was brought over in May, have I had any direct contact with the case or its issues, other than this Affidavit. I did not make an appearance in the matter, nor did I participate in the arbitration or preparation for the arbitration of the matter.

2.    I am familiar with Ms. Sharp's Motion for a New Consumer Arbitration Tribunal or in the Alternative, Motion to Alter, Amend, or Vacate the Award of Arbitrator dated August 13, 2007. I understand that paragraphs five (5) through ten (10) of said Motion directly relate to my alleged affiliation with Henry Strickland, the Arbitrator in the instant dispute.

1

3.     Long before the arbitration of the Sharp case, I made Sharp's counsel aware that I was an Adjunct Professor of Law at Cumberland School of Law, Samford University in Birmingham, Alabama (hereinafter referred to as "Cumberland School of Law"). In late 2006, Dan Batcheler and I had a conversation with both Joseph C. McCorquodale, III and J. Charles McCorquodale, IV where it was clearly made known to Mr. McCorquodale that I was an Adjunct Professor at Cumberland School of Law. In fact, during the arbitration of the *Gibby v. Southern Energy Homes, Inc.,* I advised both McCorquodales that I could not continue with the arbitration hearing on late Thursday afternoon as I had to teach at Cumberland. I published at an article in the American Journal of Trial Advocacy, where my affiliation with Cumberland School of Law is identified. See *The Source of Alabama's Abundance of Arbitration Cases: Alabama's Bizarre Law of Damages for Mental Anguish.* (copy attached). In fact, in more that one of my briefs in cases I had with the McCorquodales, I cited the article. See e.g., *Brief of Appellant in Patriot Manufacturing, Inc. v. Jackson,* 929 So.2d 997 (Ala. 2005). The article cited showed my biographical information, including being an Adjunct Professor of Law at Cumberland School of Law.

4.     I did not have any contact with Mr. Strickland regarding the Sharp case and do not believe that my acquaintances with Mr. Strickland in any way affected the outcome of the Award of Arbitrator.

5.     This Affidavit is true and correct to the best of my knowledge, information, and belief.

_____
W. Scott Simpson, Esquire

**STATE OF ALABAMA**          )
                              )

2

**JEFFERSON COUNTY** )

I, the undersigned authority, a Notary Public in and for said county and state, hereby certify that W. Scott Simpson, whose name is signed to the foregoing Affidavit, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this _5_ day of _October_ , 20_07_

_____

NOTARY PUBLIC

My Commission Expires: _____

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Sept 12, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

3

# EXHIBIT 3

# AMERICAN ARBITRATION ASSOCIATION
## ARBITRATION TRIBUNAL

IN THE MATTER OF THE ARBITRATION BETWEEN

SHELIA SHARP

-AND-

RIVER BIRCH HOMES, INC.                                    ARBITRATOR DISCLOSURE

-AND-

TIMBERLINE HOMES, INC.

CASE NUMBER: 30 181 00650 06

I believe I may have served as arbitrator in the past in a matter in which the law firm of Ritchey & Ritchey represented a party. I am unable to verify that fact in my records, however, and I can recall neither the nature of the matter nor the year of any such arbitration.

I have been on the faculty of Samford University's Cumberland School of Law since 1988. During that time, one or more attorneys in one or more of the law firms representing parties in this matter may have been students in one of the classes I taught.

_____          _____
Henry C. Strickland                        Date  10/9/06

**EXHIBIT 4**

IN THE MATTER OF ARBITRATION BETWEEN

---

SHEILA SHARP

vs.

RIVER BIRCH

---

VOLUME I

DATE TAKEN:     JULY 23 2007

TIMES:          10:00 a.m. - 4:30 p.m.

LOCATION:    Marengo County Courthouse

             Linden, AL

THE ARBITRATOR: Henry C. Strickland

                800 Lakeshore Drive

                Birmingham, Alabama 35229

                205.726.2411

DUPLICATE

```
 1                    APPEARANCES

 2

 3  ON BEHALF OF SHEILA SHARP:

 4      McCORQUODALE & McCORQUODALE

 5      BY:  CHARLES J. McCORQUODALE, IV, ESQ.

 6      226 Commerce Street

 7      Post Office Drawer 1137

 8      Jackson, AL 36545

 9      251.246.9015

10

11  ON BEHALF OF RIVER BIRCH:

12      RITCHEY & SIMPSON

13      BY:  GREGORY S. RITCHEY, ESQ.

14      3288 Morgan Drive, Suite 100

15      Birmingham, AL 35216-3084

16      205.876.1600

17

18  ON BEHALF OF RIVER BIRCH:

19      SLATEN & O'CONNOR

20      BY:  CLIFTON E. SLATEN, ESQ.

21      Winter Loeb Building

22      105 Tallapoosa Street, Suite 101

23      Montgomery, Alabama 36104

24      334.396.8882

25      COURT REPORTER: CHARITY McCULLEY, CSR
```

1                    I N D E X

2 Opening Remarks by Arbitrator Curry. . .4

3 Court Reporter Certificate. . . . . . .288

4

5

6                    - - -

7

8 MS. SHARP WITNESSES:

9 WITNESS:                      PAGE

10 Ms. Sheila Sharp

11    By Mr. McCorquodale        14

12    By Mr. Ritchey             62

13    By Mr. McCorquodale        151

14    By Mr. Ritchey             162

15    By Mr. McCorquodale        168

16    By Mr. Ritchey             169

17

18 WITNESS:                      PAGE

19 Mr. Michael Gertler

20    By Mr. McCorquodale        172

21    By Mr. Ritchey             178

22    By Mr. McCorquoadle        190

23    By Mr. Ritchey             214

24    By Mr. McCorquodale        219

25                    - - -

1 up and down.  Also, the mantle was a

2 different color, was not the right color.

3     Q.   Okay.  Can I direct your attention

4 to River Birch Exhibit 29.  Do you recall

5 signing that work order?

6     A.   Yes.

7     Q.   Is that your signature at the

8 bottom?

9     A.   It is.

10     Q.   The front door was adjusted at that

11 time?

12     A.   That's what he said.  I don't know.

13 I'm not sure.

14     Q.   Well, did you check it after he did

15 it?

16     A.   No.

17     Q.   Okay.

18     A.   Not as soon as --

19     Q.   Back door seal was installed.  Did

20 you look at that?

21     A.   I didn't see a seal.  I don't even

22 know what a seal looks like.

23     Q.   Were you there during the time the

24 repairs were made?

25     A.   I was at that time.

1    Q.   Did you not see him doing any work?

2    A.   He did something but I was not

3 standing over him when he was back there

4 working.

5    Q.   Back there is --

6    A.   Back there by the back door.

7    Q.   How about the kitchen doors, cabinet

8 doors?

9    A.   What are you asking about the

10 kitchen doors?

11    Q.   Did they replace the glass?

12    A.   He made an attempt to replace them.

13    Q.   The glass -- it was to replace the

14 glass doors.

15    A.   Three of them was, one he broke

16 attempting to fix them.

17    Q.   And, then, the back patio door was

18 adjusted?

19    A.   He worked on it.

20    Q.   And you signed here at the bottom

21 certifying the parts -- the repairs were made

22 to your satisfaction?

23    A.   At that time.  And he told me I had

24 to sign that.

25    Q.   Were you satisfied at that time?

1    A.    No.

2    Q.    So if he told you to jump off a
3 bridge, would you do that?

4    A.    I have common sense.  I'm not going
5 to jump off a bridge because I can't swim.

6    Q.    I understand.  But you did sign this
7 and then he left; right?

8    A.    Yes, he told me to sign that and he
9 left.

10    Q.    Did you not check?

11    A.    At the time I did not, not as soon
12 as he left or during the time he was there
13 fixing it.  I did not check.

14    Q.    Well, did you send anything in
15 writing to River Birch afterwards saying I
16 wasn't happy with what happened here?

17    A.    No.  This is a person that they sent
18 out that's supposed to have been certified,
19 qualified.

20    Q.    So you didn't send anything in
21 writing?

22    A.    No, I did not.

23    Q.    And I'm taking it, you didn't call
24 anybody either?

25    A.    No.

1    Q.   And you said he broke one of the

2 doors when he was changing it --

3         MR. McCORQUODALE:

4              Calling anybody when?  Calling

5              anybody when?

6         MR. RITCHEY:

7              Just asking a question.

8         MR. McCORQUODALE:

9              We object to mischaracterization.

10        ARBITRATOR STRICKLAND:

11             This is cross.  You're welcome

12             to redirect on that.

13 BY MR. RITCHEY:

14   Q.   Can I direct your attention to River

15 Birch Exhibit Number 31?  They came back and

16 replaced the cabinet doors; right?

17   A.   Uh-huh (affirmative response).  Yes.

18   Q.   And, then, they replaced the patio

19 door screen?

20   A.   Yes.

21   Q.   Is that your signature?

22   A.   No, it isn't.

23   Q.   Who is that?

24   A.   That's my name.

25   Q.   I know.  But whose signature is

1 that?

2     A.   I don't know whose it is.  It's not

3 mine.

4     Q.   Who else is in your house?

5     A.   My great grandmother and she's 100

6 years old.

7     Q.   Who else would have been there?

8     A.   As far as I know, she was there by

9 herself.

10     Q.   Do you recognize that writing?

11     A.   No.

12     Q.   Were you there at the time the

13 repairs were made?

14     A.   Not at that time, no.

15     Q.   Did you ever call or write after

16 those repairs were made and say, I got a

17 problem with it?

18     A.   Why?  Why should I call?  I didn't

19 feel like I needed to call.

20     Q.   Okay.  So you didn't need to call

21 anybody if you didn't feel like it --

22     A.   No.

23     Q.   -- satisfied --

24     A.   No, because he had attempted work on

25 it.  And still, you know, the repairs was

1 contact someone?

2    A.   I contacted someone.

3    Q.   And you live where?

4    A.   Thomaston, Alabama.

5    Q.   How did you find Mr. McCorquodale?

6    A.   Through a friend.

7    Q.   Have you seen Mr. Gertler's report?

8    A.   No.  I don't know who that is.  Who

9 is that?

10    Q.   The person that inspected your

11 house.

12    A.   No.

13    Q.   Would it be fair to say that items

14 listed in his report were never turned in by

15 you to anybody?

16    A.   Excuse me?

17    Q.   Would if be fair to say that items

18 listed in his report were never turned in by

19 you to anybody?

20        MR. McCORQUODALE:

21          She just said she didn't know

22          what was listed in the report.

23 BY MR. RITCHEY:

24    Q.   So that would be a fair statement

25 then; right?

1    A.    What would be a fair statement?

2 Would you repeat your statement again?

3    Q.    Would it be fair to say that none of

4 the items that are listed in the report were

5 ever turned in by you to anybody?

6            MR. McCORQUODALE:

7                 Objection.  Mischaracterization

8            as to what she gave notice of.

9            ARBITRATOR STRICKLAND:

10                You've not seen the report.

11           MS. SHARP:

12                I have not seen a report that

13           he's talking about.

14 BY MR. RITCHEY:

15    Q.    Would it be fair to say that you

16 never turned in any of those items then in

17 that report to anyone?

18           MR. McCORQUODALE:

19                That's a mischaracterization of

20           what she said she already gave

21           notice of.

22           ARBITRATOR STRICKLAND:

23                Based on the report, you never

24           reported anything from the report to

25           River Birch or anybody else aside

1          from --

2          MS. SHARP:

3              Not that report, no.

4 BY MR. RITCHEY:

5      Q.   So you never gave River Birch an

6 opportunity to cure any of those items;

7 right?

8      A.   Yes, I did.

9      Q.   Okay.  What items?

10     A.   The cabinets, the doors.

11     Q.   Other than that?

12     A.   The cabinets, the doors, the

13 electrical problem.  A/C, the air

14 conditioner, the windows.

15     Q.   The air conditioner.  You understand

16 that your furnace, your air conditioner,

17 stove, appliances and so forth had their own

18 separate warranties; right?

19     A.   I understand that, yes.

20     Q.   So those were not warranted by River

21 Birch; right?

22          MR. McCORQUODALE:

23              Are you talking --

24          MR. RITCHEY:

25              If you have an objection, make

1 dealership.

2    A.    Exactly.  And I made the request
3 that it was the wrong cabinet doors when they
4 first brought it from the manufacturer.

5    Q.    You told the dealer?

6    A.    Yes.

7    Q.    Unsealed floors and all that stuff.
8 You never reported to it anybody?

9    A.    No.

10    Q.    You never provided notice to anybody
11 of any other problems after March of --

12    A.    I'm not sure what day it was.

13    Q.    So you don't know.  As we sit here
14 today you don't know whether you gave notice
15 to anybody --

16    A.    I can't remember the date.  But I do
17 know that I give notice.  To give you a date,
18 that would not be justified.

19    Q.    But we are clear that there is no
20 written notice as required under the
21 warranty.

22          MR. McCORQUODALE:

23             Objection.  Mischaracterization.

24             Written notice is the work order.

25 BY MR. RITCHEY:

1    Q.    Is that correct?

2    A.    The work order is written.

3    Q.    There was no written notice that you
4    provided to River Birch or for that matter,
5    to the installer or the retailer.

6    A.    Not in my hand right now, no.

7    Q.    I want to direct your attention to
8    River Birch Exhibit Number 32, the last page
9    of the warranty.

10        In bold in the middle it specifically
11    states that we're not responsible for any
12    undertaking, representation, warranty made by
13    any other persons beyond as expressly set
14    forth in the warranty; right?

15    A.    That's what that says.

16    Q.    So River Birch is not responsible
17    for whatever the dealer may have told you;
18    correct?

19    A.    Repeat the question.

20    Q.    River Birch is not responsible for
21    whatever the dealer may have told you that
22    you feel is incorrect.

23    A.    When you say what the dealer told
24    me, told me like what?

25    Q.    Didn't you say that the dealer told

1 you you could just call?

2      A.   He told me -- not just call.  He's
3 talking about I need to contact River Birch.

4      Q.   Okay.  You just need to contact
5 River Birch.

6      A.   Contact River Birch.

7      Q.   Contact River Birch could be in
8 writing like the warranty says.

9      A.   He didn't say writing.  I gave
10 proper notice.  When they called River Birch,
11 they responded.  Someone came out.

12      Q.   He said to contact them.  What
13 thermostat were we talking about?  Exhibit
14 Number 25.  Is that the thermostat on the
15 water heater?

16      A.   He didn't specify.

17      Q.   Okay.  So what he could be saying
18 here is that he replaced the water heater
19 element, as well as the water heater
20 thermostat?

21      A.   He didn't specify as to what type of
22 thermostat it was.

23      Q.   So you don't know whether or not
24 it's your air conditioner thermostat.

25      A.   I didn't even know he did work on

1 the thermostat. He just told me element.

2     **Q.  Did you ever notify anybody at River**

3 **Birch that you didn't like the person that**

4 **came out and worked on your house?**

5     A.  No, I did not.  I didn't see a need

6 to.  It's somebody they had contracted with.

7         MR. RITCHEY:

8            I've got no further questions.

9         ARBITRATOR STRICKLAND:

10            Thank you, Ms. Sharp.

11            I've got one o'clock.  How are we

12            doing on time?  How many more

13            witnesses?

14         MR. McCORQUODALE:

15            One more witness today.

16         ARBITRATOR STRICKLAND:

17            Do you want to go ahead and break

18            for lunch?  How long do you

19            anticipate?  Probably an hour or so?

20         MR. McCORQUODALE:

21            Yeah, easily.  Cross may be

22            longer.

23         ARBITRATOR STRICKLAND:

24            Do you have any other witnesses?

25

1 order.

2     Q.   Okay.  Look at Exhibit 29.  Does

3 that look like your signature?

4     A.   It looks like it, yes.

5     Q.   And why did you sign that work

6 order?

7     A.   Because I was presented with it and

8 I was told I had to sign it.

9     Q.   Looking at Exhibit 25, does that

10 look like your signature?

11     A.   It looks like my signature.

12     Q.   And, then, looking at Exhibit 20.

13 Does that look like your signature?

14     A.   It looks like my signature.

15     Q.   But Exhibit 31 doesn't?

16     A.   It's not.

17     Q.   That's definitely not your

18 signature?

19     A.   No.

20        MR. McCORQUODALE:

21          That's all.

22             - - -

23        RECROSS-EXAMINATION

24 BY MR. RITCHEY:

25     Q.   Ms. Sharp, these repairs were done

1 in March.  How long did Mr. Harper -- how

2 long was the -- is it Jeff Harper?

3     A.    I know Jeff is his first name.

4     Q.    How did Jeff get in the house?

5     A.    My great grandmother.

6     Q.    Who else was there?

7     A.    I'm not sure who else was there.

8     Q.    We were there at your house in May

9 and there were two individuals sitting on the

10 porch.  Do you know who they were?

11    A.    My great grandmother and my cousin.

12    Q.    Your cousin.  Your cousin lives

13 nearby.

14    A.    Not really.  When you say nearby,

15 how close are you talking about nearby?

16    Q.    How far does she live?

17    A.    Maybe about five miles.

18    Q.    Is she over at your house a lot?

19    A.    No.

20    Q.    Who else lives next door to you?

21    A.    My sister.

22    Q.    Okay.  Is she home during the day?

23    A.    No.  She works.  We work together.

24    Q.    Who else could have been in the

25 house?

1    A.    I'm not sure.

2    Q.    So it could have been somebody in

3 your immediate family who may have signed it;

4 right?

5    A.    No.

6    Q.    How do you know?

7    A.    No one was there but my great

8 grandmother.

9    Q.    Could it have been your great

10 grandmother?

11    A.    She's 100.  She does not write.

12    Q.    Are you trying to say that somebody

13 at River Birch just signed your name?

14    A.    I'm not trying to say that someone

15 at River Birch signed it.  But that's not my

16 signature.

17    Q.    Okay.

18          MR. RITCHEY:

19              That's all.

20          ARBITRATOR STRICKLAND:

21              Thank you.

22          (Witness excused.)

23          MR. McCORQUODALE:

24              We call Michael Gertler.

25

1    A.    Yes.

2          ARBITRATOR STRICKLAND:

3              I took it from the camera we only

4          are examining moisture on the

5          surface or the temperature on the

6          surface.

7          MR. GERTLER:

8              We're examining temperature on

9          the surface and using a nonintrusive

10         meter to come up with the 14

11         percent.

12             I don't believe there's a

13         requirement --

14         MR. RITCHEY:

15             Can we ask what kind of meter

16         you're using?

17         MR. GERTLER:

18             A Trimax nondestructive moisture

19         detector.

20         MR. RITCHEY:

21             Is that a sheetrock moisture

22         meter?

23         MR. GERTLER:

24             It has ratings for wood,

25         sheetrock or plaster.

1      MR. RITCHEY:

2          It has ratings for sheetrock?

3      MR. GERTLER:

4          Yes, sir.

5      MR. RITCHEY:

6          Can you explain those ratings to

7      us?

8      MR. GERTLER:

9          As I understand it, it has

10     different scales, depending on what

11     you're trying to take readings of.

12     It works on conductivity of

13     electricity and electricity is

14     conducted differently in sheetrock,

15     wood or plaster.

16     MR. RITCHEY:

17         That's exactly right.  Now, what

18     is in sheetrock?

19     MR. GERTLER:

20         I don't know.

21     MR. RITCHEY:

22         You don't know what's in

23     sheetrock?

24     MR. GERTLER:

25         No.

1  MR. RITCHEY:

2   So you don't know what the meter

3  does do relative to what's in

4  sheetrock?

5  MR. GERTLER:

6   Correct.

7  MR. RITCHEY:

8   The truth is, that meter is not

9  made for testing moisture content in

10  sheetrock; correct?

11  MR. GERTLER:

12   I've used that meter for 20 years

13  and never been led astray with it.

14  MR. RITCHEY:

15   The truth is, that meter is not

16  designed to detect moisture content

17  in sheetrock; correct?

18  MR. GERTLER:

19   I don't believe that at all.

20  MR. RITCHEY:

21   Do you have the directions for

22  that?

23  MR. GERTLER:

24   No, I do not.

25

1          MR. RITCHEY:

2              The truth is, that meter cannot

3          detect to any degree of certainty

4          how much moisture is in the

5          sheetrock.

6          MR. GERTLER:

7              I disagree with that.

8          MR RITCHEY:

9              Do you have any proof that you

10         have today --

11         MR. McCORQUODALE:

12             Objection to the term any degree

13         of certainty.  Mischaracterization.

14         MR. RITCHEY:

15             Do you have anything before us

16         today that would support that a wood

17         moisture meter could be used on

18         sheetrock?

19         MR. GERTLER:

20             Well, it's manufactured by the

21         manufacturer for wood, sheetrock or

22         plastic.  It has three different

23         settings.  And I would image the

24         manufacturer wouldn't put a

25         sheetrock setting on there if it

1      wasn't made for sheetrock.

2      MR. RITCHEY:

3          Did you bring the directions with

4      you?

5      MR. GERTLER:

6          No.

7      MR. RITCHEY:

8          Have you read the directions?

9      MR. GERTLER:

10         A long time ago.

11     MR. RITCHEY:

12         Okay.  Where in the directions

13     would they have said that it can be

14     used to determine the moisture

15     content of sheetrock?  Because my

16     understanding of moisture meters are

17     that they can't.

18     MR. GERTLER:

19         Well, that's different from my

20     understanding and my 20 years of

21     experience in detecting moisture.

22     MR. RITCHEY:

23         When's the last time you read the

24     directions?

25

1      MR. GERTLER:

2         Oh, many years ago.

3      MR. RITCHEY:

4         How many years ago?

5      MR. GERTLER:

6         I don't know.

7      MR. RITCHEY:

8         Ten years ago.

9      MR. GERTLER:

10        Maybe.

11     MR. RITCHEY:

12        As we sit here today you can't

13    provide to us anything that would

14    support your statement that a wood

15    moisture meter can actually be used

16    on sheetrock; correct?

17     MR. GERTLER:

18        I'm saying that that meter is

19    designed for wood or sheetrock or

20    plastic.

21     MR. RITCHEY:

22        And that was a what kind of

23    meter?

24     MR. GERTLER:

25        Trimax.

1      MR. RITCHEY:

2          And if I'm understanding you

3      correctly, that Trimax meter will be

4      able to pinpoint accurately for us

5      exactly how much moisture is inside

6      the sheetrock; right?

7      MR. GERTLER:

8          No.  That's exactly the opposite

9      of what I said.  What I said was it

10     will give us an idea of relative

11     moisture from one place to another.

12     (Inaudible) exactly quantify the

13     sheetrock moisture content would be

14     you would have to check (inaudible).

15     MR. RITCHEY:

16         Okay.  So you cannot use it other

17     than --

18     MR. GERTLER:

19         Use it for what I'm using it for,

20     which is to indicate some parts of

21     the wall have more moisture than

22     other parts of the wall.

23     MR. RITCHEY:

24         Explain --

25

1    MR. GERTLER:

2        (Simultaneous conversation) areas

3    will have more.

4    MR. RITCHEY:

5        Try to quantify for us.  Does

6    that mean if you find one that has

7    five percent and we have one that's

8    ten percent that it's twice as wet

9    as the five percent?

10   MR. GERTLER:

11       That's my understanding, yes.

12   MR. RITCHEY:

13       Where did you get that

14   understanding?

15   MR. GERTLER:

16       From doing this for 20 years.

17   MR. RITCHEY:

18       Where did you get that

19   understanding?  Is that a guess?

20   MR. GERTLER:

21       I would assume so, yes.

22   MR. RITCHEY:

23       Just a guess.

24   MR. GERTLER:

25       Uh-huh (affirmative response).

1     MR. RITCHEY:

2         Because the truth is, you don't

3     know how that moisture meter works,

4     do you?

5     MR. GERTLER:

6         That's correct.

7     MR. RITCHEY:

8         And you don't know what's in

9     sheetrock that could be conducting

10    in that -- screwing up the moisture

11    meter figures; right?

12    MR. GERTLER:

13        Correct.

14    MR. RITCHEY:

15        The truth is, everything you just

16    said is junk science; correct?

17    MR. GERTLER:

18        I disagree with that.

19    MR. RITCHEY:

20        Don't you recall running around

21    the courthouse in Jackson and

22    getting 25 readings on it?

23    MR. GERTLER:

24        Absolutely.

25

1    MR. RITCHEY:

2       And you said that was no big

3    deal; right?

4    MR. GERTLER:

5       Because that was the courthouse

6       --

7    MR. RITCHEY:

8       Did --

9    MR. McCORQUODALE:

10      Stop interrupting the witness.

11   MR. GERTLER:

12      Can I answer the question,

13   please?

14      In that courthouse somebody did

15   us a favor of turning the air

16   conditioner way down on a very, very

17   hot humid morning.  That courthouse

18   is old and probably very poorly

19   insulated.  So the interior walls

20   had a higher moisture content than

21   they would any other day of the

22   week.  And the meter detected that.

23   It detected relative moisture.  One

24   area was more damp than another

25   area.  It doesn't mean that the

1    whole courthouse was bad.  It just

2    meant that day it was relatively

3    high in moisture.

4    MR. RITCHEY:

5        So any particular day there could

6    have a little bit more moisture and

7    a little bit less moisture; right?

8    MR. GERTLER:

9        Absolutely.  Depending on the dew

10   point on the outside, depends on the

11   relative humidity, depends on how

12   well the air conditioner systems are

13   working.  Everything changes.

14   MR. RITCHEY:

15       What happens when you hit metal?

16   MR. GERTLER:

17       You would have to hit a piece of

18   metal that would be able to conduct

19   between the two -- but it goes off

20   the scale and immediately you know

21   it.

22   MR. RITCHEY:

23       Sort of like going to 30 percent?

24   MR. GERTLER:

25       Well, it goes off the scale.  It

1    has a number past 30 percent.

2    MR. RITCHEY:

3        We move to strike any testimony

4    --

5    ARBITRATOR STRICKLAND:

6        I'm going to allow the

7    testimony. You made good points. I

8    certainly can take the law into

9    account. I'll go ahead and hear

10    what he has to say.

11 BY MR. McCORQUODALE:

12    Q.    Describe how you determined the

13 accuracy of this moisture meter for the use

14 on the walls of this home and pieces of where

15 metal might be located.

16    A.    Well, as I said, when you run into

17 metal, it immediately jumps off the scale.

18 You know if you hit metal or not. Clearly

19 because of those numbers, none of those were

20 metal because they would have registered more

21 than 30 percent. So none of those were metal

22 readings. Couldn't have been metal readings.

23    Q.    And can you describe the pattern of

24 when you would cross metal and when you get

25 away from metal?

1          (THE ARBITRATION WAS ADJOURNED AT

2  APPROXIMATELY 4:30 P.M. TO RESUME ON JULY 24,

3              2007, AT 8:30 A.M.)

4

5                   - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4 STATE OF ALABAMA)

5 COUNTY OF MONROE)

6          I do hereby certify that the

7 above and foregoing transcript of proceedings

8 in the matter aforementioned was taken down

9 by me in machine shorthand, and the questions

10 and answers thereto were reduced to writing

11 under my personal supervision, and that the

12 foregoing represents a true and correct

13 transcript of the proceedings given by said

14 witness upon said hearing.

15          I further certify that I am

16 neither of counsel nor of kin to the parties

17 to the action, nor am I in anywise interested

18 in the result of said cause.

19

20 _Charity McCulley_

21 CHARITY McCULLEY, CSR, AL-CSR-513

22 COURT REPORTER,

23 NOTARY PUBLIC

24 STATE OF ALABAMA AT LARGE

25

IN THE MATTER OF ARBITRATION BETWEEN

---

SHEILA SHARP

vs.

RIVER BIRCH

---

VOLUME I

DATE TAKEN:     JULY 24 2007

TIMES:          8:00 a.m. - 5:15 p.m.

LOCATION:    Marengo County Courthouse

Linden, AL

THE ARBITRATOR: Henry C. Strickland

800 Lakeshore Drive

Birmingham, Alabama 35229

205.726.2411

ORIGINAL

1              APPEARANCES

2

3  ON BEHALF OF SHEILA SHARP:

4      McCORQUODALE & McCORQUODALE

5      BY:  CHARLES J. McCORQUODALE, IV, ESQ.

6      226 Commerce Street

7      Post Office Drawer 1137

8      Jackson, AL 36545

9      251.246.9015

10

11 ON BEHALF OF RIVER BIRCH:

12     RITCHEY & SIMPSON

13     BY:  GREGORY S. RITCHEY, ESQ.

14     3288 Morgan Drive, Suite 100

15     Birmingham, AL 35216-3084

16     205.876.1600

17

18 ON BEHALF OF RIVER BIRCH:

19     SLATEN & O'CONNOR

20     BY:  CLIFTON E. SLATEN, ESQ.

21     Winter Loeb Building

22     105 Tallapoosa Street, Suite 101

23     Montgomery, Alabama 36104

24     334.396.8882

25     COURT REPORTER:  CHARITY McCULLEY, CSR

1              I N D E X

2 Claimant rests. . . . . . . . . . . . 130

3 Court Reporter Certificate. . . . . . . 352

4                    - - -

5

6 WITNESS:                         PAGE

7 Mr. Michael Gertler

8      By Mr. Ritchey              11

9      By Mr. Slaten              215

10

11 WITNESS:

12 Mr. Dewayne Lewis

13      By Mr. Ritchey            134

14      By Mr. McCorquodale       179

15      By Mr. Ritchey            213

16      By Mr. McCorquodale       214

17

18 WITNESS:                        PAGE

19 Mr. Francis Conlin

20      By Mr. Slaten             228

21      By Mr. McCorquodale       270

22      By Mr. McCorquodale       338

23      By Mr. McCorquodale       329

24      By Mr. Slaten             346

25      By Mr. McCorquodale       348

1  INDEX CONTINUED:

2  WITNESS:                              PAGE

3  Mr. Kevin Howell, Esq.

4       By Mr. McCorquodale              329

5       By Mr. Slaten                    334

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 a question.

2        MR. McCORQUODALE:

3          He's answering the previous

4          question.  You interrupted him.

5        MR. RITCHEY:

6          No, sir --

7        ARBITRATOR STRICKLAND:

8          You certainly got it down.  And

9          you can do it on direct.

10 BY MR. RITCHEY:

11   Q.  Now, what Code requires vapor

12 barriers on the outside?

13   A.  In any kind of conventional

14 construction or any kind of modular

15 construction in a hot and moist environment

16 you have to have a vapor barrier.

17   Q.  Thank you.  What Codes requires a

18 vapor barrier on the outside?

19   A.  I'm not an expert on Codes, I

20 haven't read them.

21   Q.  You're not familiar with any Code

22 that actually requires that, are you?

23   A.  I can't name one today, no.

24   Q.  The vapor on the outside, what are

25 you're talking about?

1    A.    When you build a house, normally

2  it's wrapped in Tyvac, which is like a sheet

3  of plastic.  The windows are flashed with a

4  Tyvac; you use stucco or whatever, you have a

5  vapor barrier underneath it to keep the

6  moisture from getting into the wall cavity

7  where it can condense.

8    Q.    So your opinion is is that Tyvac

9  acts as a vapor barrier?

10    A.    Yes, sir.

11    Q.    I'm going to show you what has been

12  marked as River Birch Exhibit 48.

13        MR. McCORQUODALE:

14            Do we have copy of this?

15        MR. RITCHEY:

16            That's it.

17            It's not that long, Charles.

18        MR. McCORQUODALE:

19            I'm reading the small print.  It

20            is that long.

21            You have no additional copies?

22        MR. RITCHEY:

23            I'm sure we can get the court

24            reporter to get you one later.

25

1          MR. McCORQUODALE:

2              None just now?

3          MR. RITCHEY:

4              No.

5    BY MR. RITCHEY:

6      Q.    If I can get you to look at number

7    4, maybe with the Arbitrator.

8              This is what I pulled off the

9    internet last night.  What does number 4 say?

10     A.    It's a question:  Is Dupont Tyvac a

11   vapor barrier?

12     Q.    What's the answer Tyvac gave?

13   .   A.    No.  Dupont Tyvac is not a vapor

14   barrier.  It is breathable, allowing moisture

15   that pass through it.

16             But Tyvac's not the only vapor

17   barrier that's used on the outside of houses.

18   I've seen people --

19     Q.    I haven't asked a question.

20          MR. RITCHEY:

21             We would like to introduce that.

22          ARBITRATOR STRICKLAND:

23             Yes.

24   BY MR. RITCHEY:

25     Q.    So your installation of Tyvac on the

1 outside of the house would still not make it

2 right. It's not a vapor barrier; right?

3    A.   Well, we're going to get into the

4 discussion --

5    Q.   Is that right? Yes or no.

6    A.   We're going to have to get into a

7 discussion about what is a vapor barrier

8 versus a vapor retardant. The industry calls

9 Tyvac a vapor barrier because -- Dupont

10 doesn't call it that, they call it something

11 else -- it's the same thing. It's designed

12 to cut down the amount of moisture that goes

13 into the wall cavity.

14    Q.   Could you please give me every

15 authoritative treatise that supports your

16 last statement?

17    A.   20 years as a licensed contractor

18 and home inspector.

19    Q.   No, no. I realize that. You've

20 told us that a million times.

21       I want an authoritative treatise

22 that supports what you just told the

23 Arbitrator?

24    A.   I don't have one.

25    Q.   Thank you. You're ASHI certified;

1 at the inspection report that Mr. Conlin did,

2 you changed your story?

3    A.   Well, we discussed already the vinyl

4 siding -- I mean, the vinyl-covered wall

5 paper.  So, yes, with respect to that one

6 item we did.

7    Q.   And with respect to more I would

8 think; right?

9    A.   No.

10    Q.   Did you review the homeowner's

11 manual?

12    A.   No.

13    Q.   Setup in instructions?

14    A.   No.

15    Q.   Did you review the warranty?

16    A.   No.

17    Q.   So you walked into the house and you

18 started to playing with your moisture meter;

19 right?

20    A.   I wouldn't call it playing.

21    Q.   Started putting it on the walls.

22    A.   We access under all the windows,

23 check the walls, draw a drawing of the house,

24 begin to organize our notes, take pictures.

25    Q.   You also have some field notes,

1  Sharp Exhibit 1A.  I believe, sir, these are

2  yours?

3     A.    Correct.

4     Q.    Help me out.  It looks to me like we

5  got these walls over here:  Five percent,

6  five percent, five percent?

7     A.    Correct.

8     Q.    Five percent, five percent, five

9  percent, and eight or five percent?

10    A.    I think that's an eight.

11    Q.    So we've got five percent all the

12  way around the walls; right?

13    A.    In most cases, the accessible ones,

14  yes.

15    Q.    And you found the moisture to be a

16  problem; right?  Based on five percent.

17    A.    Well, remember, that inspection was

18  done on December 6th of 2006, which is a

19  relatively dry period of time.

20    Q.    You did your report December 31,

21  2006.  What did you find?  Did you find

22  moisture problems?

23    A.    Well, I still considered the

24  problems of the 13 and 14 to be a moisture

25  problem.

1    Q.    In the floor?

2    A.    Correct.

3    Q.    You didn't -- you have nothing about

4  the floor problems in your report.

5    A.    Well, actually --

6    Q.    You did not claim any floor problems

7  whatsoever in your reporter; correct?

8    A.    That is the floor adjacent to the

9  wall.  I'm talking about moisture in the

10  wall.

11    Q.    Do you have anything in your report

12  before us today that claims there's any

13  problem whatsoever with the moisture in the

14  floor?

15    A.    No.

16    Q.    Five percent in the walls.  Are you

17  saying that under your professional opinion

18  there's a problem with that, such that every

19  single one of these walls needs to by ripped

20  off?

21    A.    Actually, that was the -- based on

22  that being vinyl-covered wall on the inside.

23  And we have changed that and I'm saying no,

24  you don't need to take out all the interior

25  walls.  We covered that under direct

1 examination.

2    Q. **Even if it was vinyl, what's the**
3 **problem with five percent?**

4    A. Well, in December you would expect
5 relatively low readings.

6    Q. **So I guess --**

7    A. There is no vapor barrier in the
8 wall. And as we did -- as we went back
9 yesterday or the day before, we found more
10 moisture in the walls yesterday than we did
11 in December, which is what you would expect.
12 It's going to be a seasonal thing and it
13 changes. And the sheetrock gets wet over and
14 over and over again and it causes premature
15 deterioration.

16    Q. **Well, actually, that's not unusual**
17 **for it to be wet and dry and wet and dry;**
18 **right?**

19    A. But it causes deterioration.
20 Moisture inside a house should become stable
21 with air conditioning. And it should stay
22 stable.

23    Q. **It will never stay stable because**
24 **the humidity in the air does not stay stable;**
25 **correct?**

1    A.    It will never stay stable without a
2 vapor barrier, either.

3    Q.    **Even with a vapor barrier, it will**
4 **never stay stable; correct?**

5    A.    No, that's not correct.  If you have
6 a vapor barrier and a properly functioning
7 air conditioner system and you keep the
8 relative humidity inside the house in a
9 reasonable range, than it will become stable.

10    Q.    **And I need to see some authoritative**
11 **treatise that supports that statement.**
12 **Because I don't think you know anything about**
13 **that; right?**

14    A.    No, that's not correct.

15    Q.    **Give me an authoritative treatise**
16 **that supports that.**

17    A.    As an inspector, I've done this for
18 years.

19    Q.    **20 years.  Just like the 20 years**
20 **you used when you found the vapor barrier on**
21 **the inside period of the wall; right?**

22    A.    Well, we were incorrect in that
23 statement.

24    Q.    **So with your 20 years of experience**
25 **you could be incorrect; right?**

1    A.    Absolutely everybody is -- can be

2 incorrect occasionally.

3    Q.    **The truth of the matter is, five**

4 **percent is not a problem; right?**

5    A.    No, sir.

6    Q.    **Ten percent is not a problem; right?**

7    A.    No, sir, generally not.

8    Q.    **14 percent is not a problem; right?**

9    A.    I disagree with that at 14 percent.

10 More moisture content on sheetrock you have

11 the potential to grow mold.

12    Q.    **Now, can you tell me how to**

13 **accurately determine moisture content on**

14 **sheetrock at 14 percent?**

15    A.    If you want to be completely

16 accurate, you cut the sheetrock out and send

17 it to a testing laboratory that does an

18 analysis and they tell you what the number

19 is.

20    Q.    **Otherwise, the little moisture meter**

21 **you used, absolutely is not confirmable;**

22 **right?**

23    A.    Well, it's not an absolute rule that

24 that's the number; correct.

25    Q.    **It's not something that you can**

1 scientifically prove by using a moisture

2 meter; correct?

3    A.   Probably not.

4    Q.   So any reading you got off your

5 moisture meter, you cannot scientifically

6 prove that it shows it was 14 percent, ten

7 percent or 25 percent; correct?

8    A.   Correct.  And as I said in direct

9 examination, those are relatively -- I'm

10 trying to show that there's more moisture in

11 some walls than there are in other walls.

12 More moisture in some floors than there are

13 in other floors.

14    Q.   And the percentage means nothing

15 until you actually take a piece and you ship

16 it off and you actually get it tested;

17 correct?

18    A.   The percentage can't be confirmed

19 unless you do destructive testing, which we

20 don't do.

21    Q.   You were at the Jackson County

22 Courthouse and you found 25 percent in the

23 walls, didn't you?

24    A.   That's what the meter was showing,

25 yes.

1    Q.   And did you call up anybody, any

2 political figure and say, "your walls are

3 about to cave in because I found 25 percent

4 on my moisture meter"?

5    A.   As I said at the time, I don't

6 consider that a problem.  I consider that

7 somebody had the temperature too low, the

8 building is badly insulated and there was

9 condensation in the walls.  That's not an

10 occurrence that occurs every day.

11    Q.   So you didn't think 25 percent is a

12 problem, but by God, you got five percent in

13 this house and you think you need to rip off

14 every single one of the walls and replace

15 them at the tune of more than -- approximate

16 cost:  More than the house would -- more than

17 the cost to replace the house; right?

18    A.   If the walls were vinyl-covered

19 sheetrock on the inside, it's my opinion the

20 vapor barrier needs to be on the outside.

21 The only way to fix that would be to take the

22 walls out --

23    Q.   ASHI inspector should not knowingly

24 understate or overstate the significance of

25 reported conditions; correct?

1    A.    Correct.

2    Q.    You have overstated the significance

3 of what you visually saw; did you not?

4         MR. McCORQUODALE:

5             Please stop yelling at the

6             witness.

7    A.    I'm sorry?

8 BY MR. RITCHEY:

9    Q.    Did you not?

10    A.    No, I did not.  Because in December

11 the readings are low.  In July, just as they

12 would be, they're high.

13    Q.    That's what you were --

14 (simultaneous conversation) -- was it not?

15    A.    No.  The condition I've seen over

16 and over again for 20 years.  If you don't

17 have a vapor barrier on the outside of the

18 wall, you're going to have more moisture in

19 the walls in July than you have in December.

20    Q.    You found ten percent this past

21 time.  Is that a problem?

22    A.    Lots of readings in the area of ten

23 percent, yes, sir, which --

24    Q.    Is that a problem?

25    A.    -- which compared to none, it's

1 significantly more moisture.

2    Q.   Is it a problem, Mr. Gertler?

3    A.   At this moment, no.  But continued

4 exposure --

5    Q.   So would it be fair to say that you

6 have not found a problem with the walls in

7 this house?

8        MR. McCORQUODALE:

9           Let him finish.

10    A.   I haven't finished the last answer.

11 BY MR. RITCHEY:

12    Q.   You answered no.

13    A.   I said no it's not a problem at this

14 time.  But continued exposure to that level

15 of moisture in the walls will cause

16 deterioration and eventual mold.

17    Q.   At the Givian arbitration you were

18 asked about an 11 reading that you found.

19 You were asked, is that high in your book?

20 What was your answer?

21    A.   No.

22    Q.   But, now, a ten percent reading is

23 high in your book?

24    A.   As I said, it's significantly higher

25 than it was in December.  It indicates that

1 the walls have tracked moisture over a

2 season.

3    Q.    Are you lying now or were you lying

4 then?  Which time?

5    A.    Neither one.

6          If we came back later were might

7 have a reading of 15, you never know.

8          The house needs a vapor barrier.

9    Q.    The truth is, you could have

10 readings all over the board with the moisture

11 meter; right?

12   A.    Correct.

13   Q.    You found 25 at one point.  You

14 found ten or 11 at others; right?

15   A.    We found 30 in her house.

16   Q.    There you go.  It's all over the

17 board.  But it proves nothing; right?

18   A.    No.  In 30 I'm convinced it's an

19 actual significant roof leak.  That's going

20 to be a problem.  It just hasn't shown up

21 visually yet.  It showed up only on infrared

22 and it showed up on the moisture meter.

23   Q.    That was towards the ceiling?

24   A.    That was on the ceiling.

25   Q.    Okay.  Can you explain to me how

1  that can happen with putting a moisture meter

2  up close to a ceiling?

3      A.   I'm sorry?

4      Q.   Can you explain to me why you could

5  have an abnormally high amount of moisture

6  reading on a ceiling of a bathroom?

7      A.   Because there's a roof leak directly

8  over.

9      Q.   It couldn't have been, maybe,

10 somebody taking a bath.  That wouldn't

11 happen; right?

12     A.   No, sir.  Because it showed up in

13 infrared as a roof leak, also.

14     Q.   So infrared reflects heat; right?

15     A.   No, it detects heat.

16     Q.   Detects heat.  Heat rises.

17     A.   Correct.

18     Q.   And if, say, there was a bath that

19 would have been taken at some time during

20 that day, would you not expect some of that

21 moisture to be left there on the wall?

22     A.   It could have been, but that's not

23 the shape of the infrared image.  The shape

24 of the infrared image was a perfect circle.

25 Ms. Sharp has already testified she doesn't

1 use her bathtub because it leaks.

2       The particular image we're talking

3 about is between the bathtub and the toilet.

4 The shower is on the other side of the room.

5 So I don't think the shower could possibly

6 cause that moisture.

7     Q.   You said that was in the hall bath.

8     A.   No, that's in the master bath.

9     Q.   You didn't testify yesterday that

10 that particular spot was in the small bath?

11    A.   If I did, I was mistaken.  That was

12 definitely in the master.

13    Q.   Just another mistake.

14       Last time you were asked these

15 specific questions, you said, in response to

16 -- paragraph 18:  At what number do you think

17 there is a problem?

18       You said 14.

19    A.   Right.

20    Q.   So, is it ten?  Is it 14?  25?  Is

21 it 30?  What number?

22    A.   14.

23    Q.   Okay.  So we didn't have 14 in the

24 house when you went back.  It was ten; right?

25    A.   Today it was ten.  If we don't have

1  a vapor barrier, it will eventually be 14.

2      Q.    Is that based on your engineering

3  opinion?

4      A.    That's based on my experience.

5      Q.    Based on your experience with this

6  house?

7      A.    With any house.

8      Q.    What authoritative treatise can you

9  point me to that substantiates your 14?

10     A.    As I believe I discussed in that

11 deposition, that the 14 is the point at which

12 termite growth can be sustained in the wood

13 and mold growth would be susceptible.

14     Q.    Let me ask you again:  What

15 authoritative treatise do you have that

16 supports your theory that 14 is the number?

17     A.    I have a microbiologist on staff.

18 That's the number he uses.

19     Q.    He's not here today, is he?

20     A.    Correct.

21     Q.    What authoritative treatise do you

22 have that supports --

23     A.    My microbiologist's information.

24     Q.    You have none, do you?

25     A.    I don't have anything in writing --

1    Q.   Other than hearsay.

2    A.   -- my microbiologist tells me that

3 that's the number.

4    Q.   Here you go.  Your microbiologist;

5 right?

6    A.   Uh-huh (affirmative response).

7    Q.   So the answer is no, you don't have

8 any treatise or other learned material that

9 would supplement your opinion; right?

10    A.   Correct.

11    Q.   There's nothing out there that

12 supports the Gertler opinion; correct?

13    A.   Correct.

14    Q.   ASHI requires that you not express

15 opinions that are not within your education,

16 training and experience; correct?

17    A.   Correct.

18    Q.   Your microbiologist isn't here;

19 correct?

20    A.   Correct.

21    Q.   You don't have anything to support

22 your 14, your 25, your 30, your five; right?

23 Correct?

24    A.   I don't understand the question.

25    Q.   You don't have any authoritative

1 treatise that supports any moisture reading

2 findings that you found as a problem; is that

3 right?

4    A.    No.  I don't think the ASHI

5 standards say that I can't rely on the

6 expertise of people who have higher degrees

7 of education in a certain field.  I'm relying

8 on my microbiologist, who is completely

9 qualified to discuss those things.

10    Q.    You don't have any expertise

11 yourself to support your opinion; is that

12 correct?

13    A.    Do I have personal expertise?  No.

14    Q.    Thank you.

15          Can you tell me what the Alabama

16 Department of Agriculture considers to be a

17 problem -- or the amount of moisture to be a

18 problem for termites?

19    A.    No.  I do not know that.

20    Q.    Would it surprise you that they

21 wouldn't consider that even to be a problem

22 until it gets to 20 moisture content of the

23 wood?

24    A.    That would be --

25

1 records, historical dew point records prior

2 to his inspection trying to establish that

3 condensation wasn't possible physically

4 because the dew point was never reached if

5 the temperature in the house was above 70.

6 BY MR. McCORQUODALE:

7    Q.   **The dew points varies.**

8    A.   Precisely.  It shows a graph of how

9 it varies.

10    Q.   **And 27.  Does that show dew points**

11 **in another section close to Alabama or in**

12 **Alabama?**

13       ARBITRATOR STRICKLAND:

14          **These are additional documents?**

15       MR. McCORQUODALE:

16          **Just a map, a dew point.**

17    A.   This doesn't tell me what day this

18 is.  So I don't know --

19 BY MR. McCORQUODALE:

20    Q.   **-- hot and humid climate so it's**

21 **contrary to this home's location.**

22       MR. SLATEN:

23          **We object to all that anyway.**

24       ARBITRATOR STRICKLAND:

25          **I'll take it.  I'm not sure --**

1          it's basically dew points and

2          various times and places.

3          ARBITRATOR STRICKLAND:

4              Anything further?

5          MR. RITCHEY:

6              Respondent rests.

7          ARBITRATOR STRICKLAND:

8              At this point I don't know that

9          we have time for any rebuttal.  Do

10         you have any?

11         MR. McCORQUODALE:

12             Not at this time.

13         ARBITRATOR STRICKLAND:

14             Okay.  What we have is at this

15         point you guys certainly are

16         entitled to respond to attorneys

17         fees if you want to.  We have to

18         establish a time limit for that.

19         MR. RITCHEY:

20             Is it something that we kind of

21         wait and see?  I would rather not

22         have my client incur a cost if it's

23         not absolutely necessary.

24         ARBITRATOR STRICKLAND:

25             Why don't we await a ruling on

1       merit and everything else.  And if

2       attorneys fees are an issue, that

3       will be a subsequent award.  Let's

4       put it that way.  I don't think

5       there's a need for post hearing

6       briefs unless y'all want --

7       MR. McCORQUODALE:

8           No.

9       MR. RITCHEY:

10          No.

11      ARBITRATOR STRICKLAND:

12          That being the case, I'll deem

13      the hearing closed as of this point,

14      subject to re-opening for the

15      limited purpose of responding to

16      attorneys fees.  If there's a need

17      for that that will be in the award

18      that I render and we'll open it

19      subsequent to that.

20

21  (THE ARBITRATION WAS CONCLUDED AT

22      APPROXIMATELY 5:15 P.M.)

23

24          - - -

25

1        C E R T I F I C A T E

2

3

4  STATE OF ALABAMA)

5  COUNTY OF MONROE)

6             I do hereby certify that the

7  above and foregoing transcript of proceedings

8  in the matter aforementioned was taken down

9  by me in machine shorthand, and the questions

10  and answers thereto were reduced to writing

11  under my personal supervision, and that the

12  foregoing represents a true and correct

13  transcript of the proceedings given by said

14  witness upon said hearing.

15             I further certify that I am

16  neither of counsel nor of kin to the parties

17  to the action, nor am I in anywise interested

18  in the result of said cause.

19

20  *Charity McCulley*

21  CHARITY McCULLEY, CSR, AL-CSR-513

22  COURT REPORTER,

23  NOTARY PUBLIC

24  STATE OF ALABAMA AT LARGE

25